UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
v. : Case No.: CR03-81-03ML
: (Amended Superseding Indictment)
NIGEL POTTER; :
DANIEL BUCCI; and :
BURRILLVILLE RACING ASSOCIATION:
a/k/a LINCOLN PARK, :
a/k/a LINCOLN GREYHOUND PARK, :
a/k/a LINCOLN PARK, INC. :

**DEFENDANT LINCOLN PARK, INC.'S MOTION FOR A NEW TRIAL**

Defendant, Lincoln Park, Inc. ("Lincoln Park")[1], hereby moves pursuant to Federal Rule of Criminal Procedure 33(a) that the Court grant it a new trial as the interest of justice so requires. For grounds of its motion, Lincoln Park relies on its Memorandum of Law which is filed herewith.

**Request for Oral Argument**

Defendant, Lincoln Park requests oral argument on its Motion for a New Trial and anticipates that argument will take 20 minutes.

LINCOLN PARK, INC.
By its attorneys,

John A. Tarantino

JOHN A. TARANTINO, #2586
PATRICIA K. ROCHA, #2793
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
Dated: 8/15/2005

[1] On July 18, 2005, Lincoln Park, Inc. was merged into LPRI, LLC. A copy of the Stipulation noting this fact is attached as Exhibit 1. For purposes of clarity and consistency, however, in this motion the name Lincoln Park will be used.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of August, 2005, I caused a true and accurate copy of the within to be served via hand delivery to the following counsel of record:

Craig N. Moore, Esq.
Lee H. Vilker, Esq.
United States Attorney's Office
50 Kennedy Plaza - 8th Floor
Providence, RI 02903

Anthony M. Traini, Esq.
56 Pine Street
Providence, RI 02903

C. Leonard O'Brien, Esq.
B. Jean Rosiello, Attorney
MacFadyen, Gescheidt & O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903

Debra Humm
___________________________

*341711_1.doc*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No.: CR03-81-03ML |
| | : | (Amended Superseding Indictment) |
| NIGEL POTTER; | : | |
| DANIEL BUCCI; and | : | |
| BURRILLVILLE RACING ASSOCIATION | : | |
| a/k/a LINCOLN PARK, | : | |
| a/k/a LINCOLN GREYHOUND PARK, | : | |
| a/k/a LINCOLN PARK, INC. | : | |

**DEFENDANT LINCOLN PARK, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A NEW TRIAL**

Rule 33 of the Federal Rules of Criminal Procedure authorizes the district court to grant a new trial "if required in the interest of justice." Additionally, "[m]otions for a new trial are directed to the discretion of the trial court. In considering such a motion, the court has broad power to weigh the evidence and assess the credibility of … the witnesses who testified at trial …". *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980); *see also United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979). A district court has greater power to order a new trial than to overturn a jury's verdict through a judgment of acquittal. *United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir. 1986). The remedy of a new trial is to be appropriately and sparingly used, but it is appropriate for a verdict to be set aside where it is in the interest of justice to do so. Consequently, if the verdict is against the weight of the evidence, the verdict results in a "miscarriage of justice," warranting the grant of a new trial. *Id.*

In the instant case, Lincoln Park, Inc. ("Lincoln Park") has moved for judgment of acquittal under Federal Rule of Criminal Evidence 29(a) and (c)(1). Lincoln Park also asks, in the alternative, for a new trial as the testimony of the pertinent witnesses demonstrates that the

jury verdicts are against the weight of the evidence, and that the evidence preponderates in favor of Lincoln Park.

In this regard, the following witnesses testified at trial on the issue of authorization: Francis "Skip" Sherman, Nigel Potter, Neil Chisman, Mark Elliott, and Peter Harris. Each of these witnesses testified that Daniel Bucci, the former General Manager of Lincoln Park and the only person charged in the Indictment for whose acts or omissions Lincoln Park could be found criminally responsible, was not authorized to take any actions that would serve as the basis for criminal responsibility of Lincoln Park. To the contrary, each witness testified that Dan Bucci was *not* authorized to do the acts complained of by the Government and as set forth in the Indictment.

For example, the former President of Lincoln Park, Skip Sherman, testified as follows:

> Question: And there has been some discussion and testimony about day-to-day responsibility for Lincoln Park. Do you recall that?
>
> Answer: Yes.
>
> Question: And Mr. Bucci had responsibility to oversee the day-to-day activities at Lincoln Park; correct?
>
> Answer: Correct.
>
> Question: But in terms of the overall strategy and policy of Lincoln Park, that was your ultimate responsibility as President, correct?
>
> Answer: Correct.
>
> Question: Mr. Sherman, at no time during the period that we've been talking about in 2000 up to the end of January 2001, at no time during that period was there any discussion at a Lincoln Park board meeting about a possible bonus to Mr. McKinnon; is that correct?
>
> Answer: That's correct.

Question: And you, as President of Lincoln Park, did not call or hold a meeting of the Lincoln Park board to discuss anything about a proposed bonus payment to Mr. McKinnon; is that correct?

Answer: That's correct.

Question: And, in fact, Mr. Sherman, as the President of Lincoln Park, you were against the proposal about a possible bonus payment to Mr. McKinnon; correct?

Answer: Correct.

Question: And as President, you did not authorize or approve any bonus payment to be made to Mr. McKinnon; correct?

Answer: Correct.

Question: As President, you did not authorize anyone else at Lincoln Park, any designee, to approve a payment, a bonus payment to Mr. McKinnon; is that correct?

Answer: Correct.

Question: And specifically, as President of Lincoln Park, you did not authorize Mr. Bucci to make a bonus payment to Mr. McKinnon; is that correct?

Answer: That's correct.

Question: In fact, you instructed Mr. Bucci that he was not to do that; correct?

Answer: Correct.

Question: And when you were instructing Mr. Bucci not to do that, you were speaking as the President of Lincoln Park; correct?

Answer: Yes, one of my responsibilities.

Question: I'm sorry, I didn't hear your answer.

Answer: Yes.

(7/22/2005 Transcript at 13-14)

[Referring to Government Exhibit 19]

Question: Do you see the last bulleted point in that exhibit?

Answer: Yes.

Question: Caption: "Political Expenditures"?

Answer: Yes.

Question: And you see it talks about the possible performance bonus to Mr. McKinnon and his firm; correct?

Answer: Correct.

Question: And do you see where it says no decision was reached in this matter?

Answer: Yes.

Question: And, in fact, no decision was reached; correct?

Answer: As the board, no.

Question: But you, speaking on behalf of Lincoln Park, as President of Lincoln Park, you said you were against making any such payment; correct?

[Court and counsel colloquy]

Question: You agree you were President of Lincoln Park; correct?

Answer: Yes.

Question: And you were making it clear at that meeting that you did not want the performance bonus paid; correct?

Answer: Correct.

(7/22/2005 Transcript at 15-16)

Question: Was it your understanding, Mr. Sherman, that any final decision on whether a payment would be made to Mr. McKinnon, meaning a bonus payment, that would be made by the Wembley plc board; correct?

Answer: I believe so.

(7/22/2005 Transcript at 17)

[Referring to October 18th Las Vegas Wembley USA budget meeting]

Question: I just want to focus you on that. There's no question in your mind that that meeting was not a meeting of the Lincoln Park Board of Directors; correct?

Answer: Correct.

Question: And at that meeting, I believe you testified that you also voiced an objection to a possible bonus payment to Mr. McKinnon; correct?

Answer: Correct.

Question: And when you were voicing that objection, I realize you wore a couple of different hats, you were the President of Lincoln Park; correct?

Answer: Correct.

Question: And you were the President of CEO of Wembley USA; correct?

Answer: Correct.

Question: When you were voicing your objection, you were doing so on behalf of the companies that you represented; correct?

Answer: Yes.

Question: So you were voicing the objection on behalf of Lincoln Park; correct?

Answer: Yes.

(7/22/2005 Transcript at 18-19)

[Referring to the January 24, 2001 Wembley USA board meeting]

Question: There's no doubt in your mind that is not a meeting of the Lincoln Park Board of Directors; correct?

Answer: Correct.

Question: And at that meeting, the possibility of a bonus payment to Mr. McKinnon comes up again; correct?

Answer: Correct.

Question: And you, once again, voice your opposition to it; correct?

Answer: Correct.

Question: And at that meeting on January 24, 2001, you were the President of Lincoln Park; correct?

Answer: Correct.

Question: You were President and CEO of Wembley USA; correct?

Answer: Correct.

Question: And from your perspective when you were voicing your opposition, you were doing so on behalf of Lincoln Park; correct?

Answer: Correct.

Question: A vote was not taken on the January 24th date, at that meeting, to authorize or approve a bonus payment to Mr. McKinnon; correct?

Answer: Correct.

(7/22/2005 Transcript at 20-21)

[Referring to the Lincoln Park Proposed Budget for 2001 and Beyond]

Question: There was nothing in the Lincoln Park proposed budget for 2001 and beyond that contained a possible bonus payment to Mr. McKinnon; correct?

Answer: Correct.

Question: And when you, as President of Lincoln Park, saw the proposed Lincoln Park budget and the amount budgeted for legal fees for Mr. McKinnon in that budget, you did not have any problem with that; correct?

Answer: No.

(7/22/2005 Transcript at 25)

Question: I asked you some questions about your directions to Mr. Bucci that relate to the proposed McKinnon payment. I want to focus on that line of inquiry. Okay?

Answer: Okay.

Question: You said that you had not authorized Mr. Bucci to make any bonus payment to Mr. McKinnon; correct?

Answer: Correct.

Question: You had not even authorized Mr. Bucci to have any discussions with Mr. McKinnon about any such payment; correct?

Answer: That's correct.

Question: That is something that you also objected to; correct?

Answer: Correct.

Question: And when you were instructing Mr. Bucci not to have any discussions with Mr. McKinnon, not to approve any payment for Mr. McKinnon, you were doing what you believed was in the best interest of Lincoln Park; correct?

Answer: Correct.

Question: And you believed that it would harm Lincoln Park, would hurt Lincoln Park, if there were such discussions; correct?

Answer: It could.

Question: And you believe that it would harm Lincoln Park if the proposed payment was made to Mr. McKinnon; correct?

Answer: Correct.

Question: And you made that clear to Mr. Bucci, you did not want that to happen; correct?

Answer: Correct.

Question: And when you were giving Mr. Bucci those instructions, you were doing so as President of Lincoln Park, his superior; correct?

Answer: Correct.

(7/22/2005 Transcript at 43-44)

Question: You knew that there had been at least some discussion with Mr. Bucci about whether Lincoln Park would consider making a bonus payment to Mr. McKinnon; correct?

Answer: Correct.

Question: You were adamantly against it; correct?

Answer: Correct.

Question: Made it crystal clear that you were against it; correct?

Answer: I believe so.

(7/22/2005 Transcript at 45)

Question: Mr. Sherman, you did not believe, did you – let me put some context in this question. We've talked about Mr. Bucci's duties, his day-to-day responsibilities at Lincoln Park; correct?

Answer: Correct.

Question: You did not authorize Mr. Bucci as part of his day-to-day responsibilities to have any discussion with Mr. McKinnon about a proposed bonus payment; did you?

Answer: Correct.

(7/22/2005 Transcript at 46-47)

Consequently, Mr. Sherman's testimony makes clear that:

- He was Dan Bucci's superior.
- He did not authorize Dan Bucci to have any discussions or to agree to any bonus payment for Mr. McKinnon.
- He specifically directed Dan Bucci not to have such discussions and not to make such payment.
- He took reasonable steps on behalf of Lincoln Park to ensure that would not happen.
- He believed that it would harm and not help Lincoln Park if such a bonus payment were made.

To the extent that the Government may argue that Dan Bucci's acts or omissions were authorized by Nigel Potter (against the specific directions of Skip Sherman):

- Nigel Potter is not alleged to have done so in the Indictment.

- Nigel Potter cannot have greater authority than what was given to him by the Wembley plc board.

- The testimony of the Wembley plc board members (as well as that of Nigel Potter himself) is clear and consistent; Nigel Potter did not have the authority from the Wembley plc board to agree to any bonus payment for Dan McKinnon. The evidence is undisputed that any McKinnon bonus payment was a matter reserved for the Wembley plc board.

In this regard, Neil Chisman testified:

> Answer: I, in particular, invoked the schedule of matters reserved to the board and agreed very clearly with Nigel that his raising of the subject with us, that if there was any doubt as to whether this was a matter reserved to the board, this was a matter reserved for the board.
>
> (7/28/2005 Transcript at 114-115)

Mark Elliot testified:

> Question: Can you tell us whether or not Mr. Potter had the authority to act independently on a matter that had been reserved for the board?
>
> Answer: No. This was reserved for the board. It's for the board. It's not for any individual.
>
> (7/29/2005 Transcript at 27-28)

Nigel Potter testified:

> Answer: … It had been, by virtue of my raising it with the board, a matter reserved for the board.
>
> Question: Can you tell me, when you say a matter reserved for the board, what do you mean?
>
> Answer: That the final decision on a subject which was reserved for the board will be by the board as a whole.
>
> (7/26/2005 Transcript at 125)
>
> Question: As of the end of the meeting in November of 2000, can you tell us whether or not you had the authority to approve a payment proposal to Mr. McKinnon?
>
> Answer: I did not because I had taken it to the board in October. It had then – and in so doing, I had ensured that

> this – at the end of the day, this would be a board decision, not just my decision.
>
> (7/27/2005 Transcript at 57)

Peter Harris testified:

> Question: Do you recall anything further that you said to Mr. Potter on that occasion?
>
> Answer: Yes. I think probably I was the spokesperson, but the board had generally said that Nigel was right to bring this up for discussion, it was a significant issue, it was a matter that should be reserved to the board for discussion and that we would take some further advice on it and discuss it further with him.
>
> (8/2/2005 Transcript at 90)

Only the Wembley plc board could authorize and approve a McKinnon bonus payment. In fact, the evidence is uncontradicted and establishes that the Wembley plc board did not authorize and approve any McKinnon bonus. To the contrary, the evidence shows that:

- Nigel Potter was directed to proceed with caution.
- Nigel Potter was directed to obtain a specific and detailed proposal.
- Nigel Potter had no authority as an individual to reach any agreement, make any decision or authorize Dan Bucci to do so.
- Lincoln Park and Wembley plc took reasonable steps to prevent any improper act or omission, and Lincoln Park never approved or authorized a possible McKinnon bonus payment. Nor did it authorize Dan Bucci to make any such payment.

The Court's jury instruction on corporate liability makes clear that in order for the Government to sustain its burden of proof beyond a reasonable doubt against Lincoln Park on any of the charges contained in the Indictment, "the Government must prove beyond a reasonable doubt that each of the essential elements to the offense charged was committed by an officer, director, employee or agent of the corporation, Lincoln Park." The *only* person alleged to have been acting on behalf of Lincoln Park in the Indictment is Dan Bucci. The Court's

instruction further confirms that the Government must also establish each of the following three elements:

- "First: that each of the acts committed by the officer, director, employee or agent were within the course and scope of the employment or agency given to him by the corporate defendant, or, if not within the course and scope of such employment or agency, that the act of the officer, director, employee or agent was later approved or adopted by the corporation;"

Here, the evidence preponderates against any finding that Dan Bucci was authorized by the corporate defendant, Lincoln Park, to act in the way alleged by the Government. The fact that Lincoln Park authorized Dan Bucci to be in charge of political issues in *general*, cannot override the *specific* instructions given to Dan Bucci by his direct superior, the President of Lincoln Park, Skip Sherman, not to agree to or make any such payments. There is no evidence that Dan Bucci's actions were approved or adopted by Lincoln Park.

- "Second: that each of the acts committed by the officer, director, employee or agent were of the kind which is authorized by the corporation to perform;"

The testimony is directly to the contrary; that is, Dan Bucci was directed not to take such actions.

- "Third: that the officer, director, employee or agent committed each of the essential elements of the offense with the intent to benefit the corporation as opposed to himself or someone else."

The evidence preponderates in favor of Lincoln Park on this element as well. Government Exhibit 45, the Wembley plc Budget, shows that even if a $600,000 bonus payment/retainer were ever made, it was assumed that there would be no additional machines at Lincoln Park and no change in the VLT drop. Additionally, as Mr. Sherman testified, he believed that a bonus payment would harm rather than help or benefit Lincoln Park.

The Court's instructions also made clear how the jury should determine whether an act was committed within the course and scope of employment. The Court instructed: "The evidence must show that the act related directly to the general duties that the officer, director,

employee or agent was expected to perform by the defendant corporation." Here, Lincoln Park had expressly directed Dan Bucci not to take such actions as part of Dan Bucci's general duties, and Lincoln Park did not authorize Dan Bucci as part of his day-to-day responsibilities to have any discussion with Mr. McKinnon about any proposed bonus payment or to agree to any such payment.

Even more importantly, however, the Court instructed the jury that: "[A]n officer, director, employee or agent does not act within the course and scope of his employment if that person performs an act which the corporation has, in good faith, forbidden its officers, directors, employees or agents to perform. Similarly, a corporate defendant may not be held responsible for actions which it tries to prevent."

The evidence preponderates in favor of Lincoln Park: the corporation, Lincoln Park, forbade Dan Bucci to take actions concerning a Dan McKinnon bonus, and it took reasonable steps to prevent that from happening. This is shown by the testimony of Skip Sherman and also by the actions of the Wembley plc board, which reserved to itself any decision on whether a bonus should be paid. Consequently, Nigel Potter had no power to agree to do so; Nigel Potter had no power to authorize Dan Bucci to do so; Dan Bucci had no power to do so; and each was directed by Wembley plc and Lincoln Park, respectively, not to do so.[1]

For these reasons, and in the interest of justice, Lincoln Park requests that the Court grant Lincoln Park a new trial.

[1] The so-called "dotted line" reporting from Dan Bucci to Nigel Potter cannot create authority when none exists from the Lincoln Park Board or from Wembley plc.

LINCOLN PARK, INC.
By its attorneys,

/s/ John A. Tarantino

JOHN A. TARANTINO, #2586
PATRICIA K. ROCHA, #2793
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
Dated: 8/15/2005

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of August, 2005, I caused a true and accurate copy of the within to be served via hand delivery to the following counsel of record:

Craig N. Moore, Esq.
Lee H. Vilker, Esq.
United States Attorney's Office
50 Kennedy Plaza - 8th Floor
Providence, RI 02903

Anthony M. Traini, Esq.
56 Pine Street
Providence, RI 02903

C. Leonard O'Brien, Esq.
B. Jean Rosiello, Attorney
MacFadyen, Gescheidt & O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903

/s/ Debra Hurm

*341713_1.doc*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NIGEL POTTER;<br>DANIEL BUCCI; and<br>BURRILLVILLE RACING ASSOCIATION<br>a/k/a LINCOLN PARK,<br>a/k/a LINCOLN GREYHOUND PARK,<br>a/k/a LINCOLN PARK, INC. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No.: CR03-81ML |

## STIPULATION

It is hereby stipulated that on July 18, 2005, the Defendant corporation, Lincoln Park, Inc., was merged into LPRI, LLC, a Rhode Island limited liability company.

Dated: August 3, 2005

CRAIG N. MOORE
LEE H. VILKER
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
*Attorneys for United States of America*

JOHN A. TARANTINO, #2586
PATRICIA K. ROCHA, #2793
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
*Attorneys for Lincoln Park*

C. LEONARD O'BRIEN, #1886
B. JEAN ROSIELLO, #2886
MacFadyen, Gescheidt & O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903
*Attorneys for Nigel Potter*

ANTHONY M. TRAINI, #4793
56 Pine Street
Providence, RI 02903
*Attorney for Daniel Bucci*

340874_1.doc

